CHARLES CARBONE, ESQ.
(CA SBN 206536)
PRISONER RIGHTS ATTORNEY
LAW OFFICE
POB 2809
SAN FRANCISCO, CA 94126
TELEPHONE: (415) 981-9773 & (415) 531-1980
EMAIL: CHARLES@CHARLESCARBONE.COM

MARK A. REDMOND, ESQ.
(CA SBN 161520)
THE LAW OFFICES OF MARK REDMOND, P.C.
555 University Avenue, Suite 154
Sacramento, California 95825
Telephone: (916) 444-8240
Email: mr@markredmondlaw.com

Attorneys for Plaintiff, FERNANDO SAMANIEGO

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FERNANDO SAMANIEGO,<br><br>Plaintiff,<br><br>vs.<br><br>CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION, a State Agency; CALIFORNIA STATE PRISON, SACRAMENTO, a State Prison; CDCR SECRETARY RALPH DIAZ; (Acting) WARDEN JEFF LYNCH, individually and in their official capacities;<br><br>and DOES 1-10, inclusive,<br>Defendants. | Case No.<br><br>**COMPLAINT FOR DAMAGES FOR CIVIL RIGHTS DEPRIVATIONS UNDER 42 U.S.C. § 1983**<br><br><u>**DEMAND FOR JURY TRIAL**</u> |

Plaintiff Fernando SAMANIEGO ("Plaintiff"), brings this Complaint against CDCR, CSP-SAC, CDCR SECRETARY RALPH DIAZ, (Acting) WARDEN JEFF LYNCH, and DOES 1 through 10, inclusive, and each of them (hereinafter collectively "DEFENDANTS"), and alleges as follows:

**JURISDICTION**

1. This is a civil rights action arising under the United States Constitution and the Civil Rights Act pursuant to 42 U.S.C. § 1983 and the Eighth and Fourteenth Amendments to the United States Constitution, wherein Plaintiff seeks to redress deprivations by ALL DEFENDANTS and DOES 1 though 10, inclusive. Jurisdiction in this Court is conferred by 28 U.S.C. §§ 1331 and 1343.

2. Venue is proper in the Eastern District of California pursuant to 28 U.S.C. § 1391, as the underlying acts, omissions, events, injuries and related facts upon which the present action are based, occurred at California State Prison, Sacramento ("CSP-SAC"), located in the County of Sacramento, State of California.

**PARTIES**

3. Plaintiff FERNANDO SAMANIEGO is an adult qualified to bring suit on his own behalf.

4. Defendant CALIFORNIA DEPARATMENT OF CORRECTIONS AND REHABILITION (CDCR) is a California state agency which operates the correctional facility Defendant CSP-Sacramento (CSP-SAC).

5. CSP-SAC is the state-run prison facility where SAMANIEGO was incarcerated at the time of the events giving rise to this litigation.

6. CDCR and CSP-SAC acted through its agents, employees, and servants, including its policymakers CDCR SECRETARY RALPH DIAZ and (Acting) Warden JEFF LYNCH.

7. In their individual and official capacities, CDCR SECRETARY RALPH DIAZ and (Acting) Warden JEFF LYNCH each possessed the power and authority to adopt policies and prescribe rules, regulations and practices affecting all facets of training, supervision, control,

employment, assignment and operation of CSP-SAC where Defendant SAMANIEGO was housed as an inmate under the sole control and custody of CDCR as a duly convicted person.

8. Defendants RALPH DIAZ and JEFF LYNCH each personally devised, planned and operated the immediate supervision, policies, and actions taken by correctional staff at CSP-SAC where SAMANIEGO's injuries arose.  As such, Defendant CDCR SECRETARY RAPH DIAZ and JEFF LYNCH are liable for violating SAMANIEGO's rights, including but not limited to failing to protect SAMANIEGO from other inmates who attacked him in a manner that was wholly preventable and avoidable, and which needlessly exposed SAMANIEGO to catastrophic injuries described herein.

9. Defendants RALPH DIAZ and JEFF LYNCH were, at all times relevant, responsible for devising and implementing the security protocols and procedures for the safe housing, transport and mixing of medium and high security inmates at CSP-SAC, as well as all procedures, policies and directives concerning the training, supervision, manner, and practices by which correctional staff at CSP-SAC and or DOES 1-10 were to quell any violence, disturbance, or melee at CSP-SAC occurring among inmates and/or among inmates and staff.

10. And Defendants RALPH DIAZ and JEFF LYNCH were, at all relevant times, responsible for all policies, training and supervision of correctional staff at CSP-SAC, including but not limited to DOES 1 through 10, for decisions regarding the timing and manner of the medical attention to be utilized on prison grounds to treat any inmate, including SAMANIEGO, who was injured and in need of serious medical attention.

11. At all relevant times mentioned herein, ALL DEFENDANTS and DOES 1 through 10, inclusive, were residents within the County of Sacramento, State of California.

12. Plaintiff is informed and believes, and alleges, that at all relevant times, DEFENDANTS and DOES 1 through 10, inclusive, were employees, agents and/or servants of the CDCR, acted within the course and scope of said employment, agency and/or service, and possessed the power and authority and were charged by law with the responsibility to enact policies and to prescribe rules and practices concerning the operation of the CDCR facilities, including CSP-SAC, and which concerned the means by which the life and safety of inmates were secured, the

criteria for placing different groups of inmates together in custody, the placement of an inmate in areas of CSP-SAC appropriate to safeguard the life and safety of the inmates, the manner in which threats to the life and safety of an inmate were to be evaluated and acted upon, what safeguards were in place to prevent inmates who posed a threat to others in the facility from being permitted physical access to others, what actions were taken when an inmate is attacked or injured while incarcerated, and what methods of surveillance were to be used within each facility to insure immediate response to prevent or lessen incidents of violence occurring in the facility.

13. SAMANIEGO is ignorant of the true names and capacities of Defendants sued herein as DOES 1 through 10, inclusive, and therefore sues these Defendants by such fictitious names. SAMANIEGO is informed, believes and alleges, that each of the fictitiously named defendant is legally responsible, intentionally, negligently or in some other actionable manner, for the events and happenings hereinafter referred to, and thereby legally caused the injuries, damages, and violations and/or deprivation of rights herein alleged. SAMANIEGO will seek leave of Court to amend this Complaint and state the true names and/or capacities of said fictitiously named Defendants when those have been ascertained.

14. The reason why SAMANIEGO is ignorant of the true names and capacities of Defendants sued herein as DOES, inclusive, is that they have been unascertainable as of the date of filing this Complaint, as many of these DOES may be employees, agents or representatives of Defendants CDCR and CSP-SAC and as such many of the records are protected by state statute and can only reasonably be ascertained through the discovery process.

**EXHAUSTION OF ADMINISTRATIVE REMEDIES**

15. Plaintiff SAMANIEGO exhausted his administrative remedies on August 5, 2019, when SAMANIEGO received a denial of his administrative appeal (a.k.a. CDCR 602) by the Chief of Inmate Appeals in Sacramento after proceeding through two previous levels of administrative review.

16. SAMANIEGO'S administrative appeal efforts under log number SAC-B-19-00484 raised the facts and legal claims directly at issue in this Complaint including the identification, prevention, and quelling of the attack that SAMANIEGO suffered as well as the manner of the

removal of SAMANIEGO after the attack took place. As per the decision of the Chief of Inmate Appeals, SAMANIEGO was informed that "the institution has reported to the appellant that an inquiry was conducted and the actions of the staff were determined to be in compliance with policy."  Moreover, the Chief of Inmate Appeals noted, "This decision exhausts the administrative remedy available to the appellant withing CDCR."

**FACTS**

17.	Plaintiff SAMANIEGO is a "second term" offender who was serving his second prison term when the incident(s) arose giving rise to this action. Hence, his *first* term of conviction and custody in CDCR is relevant because DEFENDANTS at all times were aware of and or had actual knowledge of the reported criminal history, custody status, and security concerns relating to his first term in CDCR.  Prison records are maintained  by CDCR and DEFENDANTS such that prison records of any prior terms, like SAMANIEGO's first term, are available, utilized, and reviewed by DEFENDANTS in deciding how to safely house SAMANIEGO in any subsequent prison terms.

18.	In his first term, SAMANIEGO was housed starting in 2011 on a determinate term of three years for a Los Angeles County conviction for car-jacking which he committed at eighteen years of age.  While housed in CDCR, he was identified, labeled and deemed by CDCR officials and agents as an alleged member of a "Sureno" street gang known as East Side Bolen.  While serving his first term, SAMANIEGO was housed in North Kern State Prison, briefly out-of-state in Arizona, and Pelican Bay State Prison, where he ultimately paroled from.

19.	Notably, during his first term, he was housed largely in either General Population yards and/or in administrative segregation.  Time spent in administrative segregation during his first term was attributable to SAMANIEGO incurring approximately fourteen serious rules violations – with approximately three for alleged battery on other inmates.  Some of the inmates allegedly injured were indeed members or associates of street gangs, prison gangs, and or a CDCR

recognized Security Threat Group (STG).[1]  Notably, a disciplinary history of fourteen rules violations in three years is significant.

20. Like the near majority of inmates coming out of CDCR at that time, SAMANIEGO recidivated several months later when he was arrested, and ultimately convicted of child endangerment; and was sentenced to a second determinate term of four years which he was originally to serve eighty percent, but which he is now to serve sixty-six percent under Proposition 57, which increased the available good-time credit for non-violent, non-serious offenders such as SAMANIEGO.  Indeed, his present, expected Release Date is May 4, 2022.

21. SAMANIEGO's criminal conviction for "child endangerment" is a crime that amongst the prison population in California is considered undesirable because it is a crime against a child, and ALL DEFENDANTS were well-aware that inmates housed in CDCR routinely target and attack inmates convicted of offenses where the victim is a child or minor.

22. Upon entering CDCR in December 2014, for his second term, at the Reception Center at North Kern State Prison, SAMANIEGO informed correctional staff and CDCR that he elected to "drop-out" of his alleged Sureno street gang, and wished to be designated as a Sensitive Needs Yard ("SNY") inmate because he expressly wised to dis-avow participation in activities in furtherance of the unlawful objectives of Sureno street and or Sureno prison gangs.

23. SAMANIEGO no longer wanted to further his gang ties, and he also knew that his unlawful activities in his prior term could expose him to harm now that he would be spending additional years in CDCR custody because during his first term SAMANIEGO fought with and had physical altercations with members and associates of street gangs, prison gangs and STGs.

24. Moreover, SAMANIEGO knew that his conviction of child endangerment could similarly expose him to injury and or attack by fellow inmates.

25. SAMANIEGO thereafter was placed on SNY prison yards at North Kern State Prison, Kern Valley State Prison, and CCI-Tehachapi.  These SNY yards are designed by CDCR generally to promote the safety and welfare of inmates – who for a variety of reasons such as: an

---

[1] Security Threat Group or STG is a term used by CDCR to identify criminal organizations or groups of individuals who are a threat to the safety and security of CDCR's prisons, staff, the public, and the inmate population.

1  undesirable criminal conviction, denouncement of gang ties, mental health needs, notoriety, and or
2  known or suspected enemies, among other reasons – by housing SNY inmates apart from the
3  "General Population" where the bulk of the inmate population lives and works commensurate with
4  their custody status.

5      26.   Notably, at each of the respective prisons where SAMANIEGO was housed,
6  excluding CSP-SAC, SAMANIEGO was housed in a SNY facility where the purposeful objective
7  was to separate SAMANIEGO from known enemies, or street gang or prison gang members or
8  associates as well as those in STG's.  Notably, as a SNY inmate, DEFENDANTS knew at all times
9  that SAMANIEGO would be vulnerable to animus and assault by inmates active and or allegiant to
10 street gangs, prison gangs and or STG's.  In fact, DEFENDANTS knew at all times that
11 SAMANIEGO's designation as a SNY inmate -- while placing him in special animus with active
12 Sureno gang members and associates -- would keep him in harm's way for potential attack and
13 injury by any member and associate of any street gang, prison gang and or STG.  At all times,
14 DEFENDANTS knew that inmates like SAMANIEGO with elected SNY designation were
15 vulnerable and prone to assault, attack, and serious injury by inmates who were involved in,
16 allegiant to, and or under the direction of street gangs, prison gangs, and or STGs.

17     27.   DEFENDANTS were well-aware of the dangers of housing, locating, or placing
18 SNY inmates near to or in proximity to inmates in general population who are still loyal to,
19 sympathetic to, or merely under the control or direction of members or associates of street gangs,
20 prison gangs, and or STGs.  DEFENDANTS are well-aware that housing, locating, or placing SNY
21 inmates, like SAMANIEGO, near to or in proximity to inmates in general population or previously
22 in general population can and may result in serious injury and or death to SNY inmates.

23     28.   On his second term, SAMANIEGO was housed first at NKSP from December 31,
24 2014 until October 7, 2015.  While at NKSP, SAMANIEGO incurred no serious rules violations,
25 was not availed of programmatic opportunities, and was designated as SNY status.

26     29.    SAMANIEGO was housed next at KVSP from October 7, 2015 to September 14,
27 2017.  While at KVSP, SAMANIEGO was a SNY inmate, took GED classes, and participated in
28 Narcotics Anonymous classes as well as Criminals & Gang Members Anonymous.

30. Such participation in rehabilitative and educational coursework is known to DEFENDANTS to be discouraged, disallowed, stigmatized, and or frowned upon by members and associates of all prison gangs, street gangs and STGs. Of note, SAMANIEGO participated in Criminal & Gang Members Anonymous (CGA) which is a "twelve-step" program dedicated to gang diversion and to ridding its members of gang and or criminal thinking. Accordingly, prisoners who participate in "CGA" and or similar rehabilitative programs are often and routinely targeted for assault and attack by members and associates of all prison gangs, street gangs and STGs stemming from participation in rehabilitative programming including but not limited to CGA.

31. While housed at KVSP, SAMANIEGO incurred approximately three serious rules violations for: refusing a urinalysis, and two batteries on an inmate with a weapon. For these offenses, he was confined to administrative segregated housing. In fact, on September 14, 2017, SAMANIEGO was moved to "Z Unit" at KVSP where he was subject to additional restrictions regarding his movement and custody.

32. While in custody on his second term, and while housed at KVSP, SAMANIEGO indeed incurred a third term- known as a "*In Re Thomson*" term for battery on a prisoner with a weapon occurring on February 6, 2016, resulting in an additional consecutive term of six years. In summary, allegedly, SAMANIEGO was housed in proximity to his step-father, Chris Bowen, and the two argued over a family dispute and a battery occurred. Notably, Chris Bowen is now out of CDCR custody, and enjoys an amicable relationship with SAMANIEGO.

33. On November 9, 2017, SAMANIEGO was transferred to CCI-Tehachapi (CCI) where he remained a Level IV (maximum) security inmate with SNY status, and accordingly was housed in a SNY facility at CCI. While at CCI, SAMANIEGO continued with his GED classes and enjoyed playing sports such as handball, basketball, and running. He did, however, incur two serious rules violations – one related to inmate manufactured alcohol and the other related to delaying a correctional officer in the performance of their duties.

34. At all times, during his second term, SAMANIEGO's face was covered with tattoos indicating his former gang affiliation, thereby readily telescoping and projecting in an unusually conspicuously explicit manner that SAMANIEGO had either past (or by appearance – present) gang

8
COMPLAINT

ties, thereby uniquely subjecting him to potential attack or assault by active gang or STG members or associates because any inmate would immediately see that SAMANIEGO had gang ties – past or present – given his facial tattoos.

35. DEFENDANTS would have and did know at all times that SAMANIEGO had former gang ties given his facial tattoos because DEFENDANTS receive training and knowledge as correctional officers, officials, and administrators on how tattoos evidence gang ties.

36. During his second term, SAMANIEGO was designated as "CCCMS" and then as "EOP" designation (as of August 2018) by CDCR and DEFENDANTS confirming that SAMANIEGO was eligible for, and indeed, in need of special mental health services having suffered from depression, anxiety and psychosis. As either, and or both, a CCCMS and EOP designated inmate, SAMANIEGO was uniquely vulnerable and prone to attack and assault by inmates without such designation – including and especially those in or loyal to prison gangs, street gangs or STG groups because amongst those criminal groups, CCCMS and EOP inmates are considered "soft" and "weak," and as such, CCCMS and or EOP inmates are subject to ridicule, attack, and or harm because of their mental health designation and the stigma that portions of the inmate population assign to those like SAMANIEGO with mental health needs.

37. Notwithstanding his mental health needs and his CCCMS and EOP designation, SAMANIEGO was in near perfect physical health prior to the injuries at issue in this Complaint. Like most young men, he was able-bodied, healthy, and in good physical condition as he enjoyed a variety of athletic activities, and could competently perform duties in any employment setting.

38. On September 26, 2018, SAMANIEGO was transferred to CSP-SAC ("B" Facility) where he was placed by DEFENDANTS on a "Non-designated Programming Prison Yard."

39. Prior to such placement, on or near May 2018, CDCR and ALL DEFENDANTS implemented a policy of "Non-designated Programming Yards" such that SNY Inmates would no longer necessarily be segregated from inmates in General Population prison yards despite such integration placing known members and or associates of street gangs, prison gangs and STGs on the same yard, and housed in the same facility with prisoners – like SAMANIEGO -- who were previously designated SNY, and or who had related security concerns which would otherwise

prevent or militate against integrated housing.  As per policies authored, devised, supervised and implemented by ALL DEFENDANTS, they were to ascertain the desirability and safety of housing SAMANIEGO in a Non-Designated Programming Yard so that SAMANIEGO's safety concerns given his multiple statuses – having been convicted of a crime against a child, having renounced his former gang ties and electing SNY designation, having highly visible gang tattoos on his face, having incurred disciplinaries in prison involving fighting and physical altercations against gang and STG members and associates, having participated in prosocial anti-gang programming, and having received mental health services under CCCMS and EOP designation --- could be carefully reviewed.

40.     On September 28, 2018, SAMANIEGO appeared before a classification committee for consideration for placement on CSP-SAC's "Non-designated Programming Prison Yard." Related records reveal that inadequate or insufficient consideration was placed upon the safety concerns highlighted herein – individually and in the cumulative -- which DEFENDANTS were well-aware posed a direct and actual threat to SAMANIEGO'S welfare.

41.     Nor is it certain that DEFENDANTS sufficiently and cautiously reviewed the critical case and custody factors of the five assailants who, as prisoners, attacked SAMANIEGO in a coordinated manner on November 1, 2018, so as to prevent the integration of the alleged assailants into the "Non-designated Programming Prison Yard" at CSP-SAC.

42.     DEFENDANTS were indeed well-aware that the policy and manner of implementation of "Non-designated Programming Prison Yards" produced a spike in injuries, batteries, and assaults amongst the inmate population at various prisons in California so as to warrant a careful and highly deliberate manner of integration so as to avoid preventable assaults and melees amongst prisoners for whom it was likely, if not nearly certain, that they would be harmed such as SAMANIEGO due to one or more special aspects of his custody status including: his crime against a child, his dis-avowment of gang ties, his SNY status, his participation in CGA and other pro-social activities, his disciplinary record involving past fighting and or assaults on fellow inmates, and or his EOP and CCCMS status.

43. DEFENDANTS knew that each of, or in the cumulative, these factors would heighten the substantial risk of serious injury to SAMANIEGO if he was housed with inmates such as the very assailants who harmed him.

44. On or around the morning of November 1, 2018, at CSP-SAC, SAMANIEGO was entering an integrated yard. After he took few steps onto the yard, he was attacked by five assailants, two of whom were armed with inmate manufactured weapons. Allegedly, the assailants were Javier Cervantes (AH0612), Edgar Flores (AE9033), Jose Avila (BC2602), Aaron Stapleton (G36652), and Leonard Cortez (AM9870). SAMANIEGO alleges that such individuals have ties to street gangs, prison gangs, and or STGs, and or were enemies of SAMANIEGO, and that the resulting animus was either known or easily knowable to DEFENDANTS prior to the attack.

45. SAMANIEGO was stabbed in the bladder and ear, and when he tried to escape by running away, but he was pushed to the ground and beaten, stabbed in the face, and eventually lost consciousness which he came in and out of during and after the attack.

46. SAMANIEGO recalls initially seeing approximately five Correctional Officers including DOES 1-10, and as the attack progressed seeing perhaps as many as fifteen officers including DOES 1-10 who were present.

47. Prior to losing consciousness, SAMANIEGO saw approximately five correctional officers observing the attack. SAMANIEGO avers that the officers, including DOES 1-10, did not intervene, nor take sufficient action utilizing the tools and or tactics available to them necessary to stop the initial and on-going attack upon him.

48. One tear gas grenade was released from a distance of approximately fifteen feet away. The dispense of the tear gas grenade was insufficient to quell the attack because the assailants continued the attack, and then moved away from SAMANIEGO, and proceeded to stab another inmate on the yard. This second victim is not known presently to SAMANIEGO.

49. The assailants yelled "Fuck the PC's," a reference to SAMANIEGO's former gang affiliation because "PC" in prison parlance refers to those inmates housed in "Protective Custody," and is synonymous with SNY inmates.

50. After the attacked ended, SAMANIEGO could not breathe and suffered a collapsed lung. He lay on the ground helpless.

51. Insofar as the medical attention provided at such time, SAMANIEGO was <u>not</u> given a neck brace, and was transferred by orange cot -- without a brace and without being medically secured to the cot -- to the prison infirmary where his vitals were not taken.

52. After fifteen minutes, an ambulance arrived, and SAMANIEGO was given a neck brace only then by medical personnel from the ambulatory services, an IV was administered in the ambulance, and SAMANIEGO was transported to UC Davis Medical Center where he remained in Intensive Care, and was later transferred to Queen of the Valley Medical Center in Napa, California.

53. SAMANIEGO was stabbed in the spine, his neck was broken at vertebrae 3, and he was stabbed at 11 and 12.

54. After his stay at UC Davis, he was at Queen of the Valley for four weeks.

55. As the result of his serious injuries, he is now a complete quadriplegic.

56. He arrived at the medical unit at CMF-Vacaville in early December 2018.

57. On May 7, 2019, SAMANIEGO was granted "Medical Parole" by the Board of Parole Hearings due to his serious and debilitating injuries such that the Board of Parole Hearings recognized that his status as a complete quadriplegic meant that he could not pose an unreasonable risk to public safety because of his severe physical limitations, and that he was consequently eligible for medical parole such that he would be permitted to serve the remainder of his term in a CDCR contracted medical facility where he is under the control and custody of CDCR.

58. SAMANIEGO is currently in custody at San Fernando Acute Care Hospital in Sylmar, California serving out the remainder of his term on medical parole.

59. SAMANIEGO is currently 27 years old.

**DAMAGES**

60. As a direct and proximate result of the deliberate indifference and wrongful conduct of DEFENDANTS, Plaintiff has suffered and continues to suffer injury, damage and loss, including, but not limited to:

      a. Severe emotional distress

      b. Impairment of any earning capacity now or in the future;

      c. Medical expenses, past and future;

      d. Pain and suffering;

      e. Paralysis;

      f. Loss of enjoyment of life,

Resulting in Plaintiff's economic and non-economic damage in amounts to be proven at the time of trial.

61. Pursuant to 42 U.S.C. 1988(b), Plaintiff is entitled to recover his reasonable attorney fees incurred herein.

## FIRST CAUSE OF ACTION

## FOR MONETARY RELIEF UNDER 42 U.S.C. § 1983

## (AGAINST ALL NAMED DEFENDANTS and DOES 1-10)

62. SAMANIEGO repeats and re-alleges each allegation contained in paragraphs 1 through 61 above as if fully set forth herein.

63. ALL DEFENDANTS and DOES 1 through 10, inclusive, while acting under color of law, deprived SAMANIEGO of his civil rights under the Eighth and Fourteenth Amendments to the United States Constitution when they subjected him to cruel and unusual punishment by failing to protect him from assault by other inmates, and acted with deliberate indifference of SAMANIEGO's rights by the following acts:

64. Placing SAMANIEGO, an objectively vulnerable inmate -- based on his facial tattoos; his disavowment of gang activity; his participation in prosocial groups such as CGA and others; his underlying commitment offense being despised by other prisoners; his SNY status throughout his entire second term; his in-custody disciplinary history in both of his prison terms (first and second) evidencing violence amongst rivals, gang and STG members and associates; as well as his CCCMS and EOP status; and enemies known or easily known by DEFENDANTS – into an integrated yard without nearby supervision, watching, monitoring, and or protecting him;

65. Placing SAMANIEGO, whose face bears highly-visible gang related tattoos into an integrated yard with individuals who had an incentive, opportunity, and motive to attack SAMANIEGO in a coordinated fashion, and who did so stating, "Fuck the PC's," as a direct reference to his status as a former-gang member;

66. Placing SAMANIEGO, a known former-gang member who had disavowed gang activity into an integrated yard with individuals who had an incentive, opportunity, and motive to attack SAMANIEGO in a coordinated fashion, and who did so stating, "Fuck the PC's," as a direct reference to his status as a former-gang member;

67. Placing SAMANIEGO, an inmate who had participated in pro-social activities, such as Criminal & Gang Members Anonymous, into an integrated yard with individuals who had an incentive, opportunity, and motive to attack SAMANIEGO in a coordinated fashion;

68. Placing SAMANIEGO, an inmate whose commitment offense of child endangerment is well-known, among crimes against children, to be stigmatized by inmates, and which can routinely endanger an inmate convicted of such into an integrated yard with individuals who had an incentive, opportunity, and motive to attack SAMANIEGO in a coordinated fashion;

69. Placing SAMANIEGO, a SNY inmate who selected his SNY status into an integrated yard with individuals who clearly had an incentive, opportunity, and motive to attack SAMANIEGO in a coordinated fashion, and who did so stating "Fuck the PC's" as a direct reference to his status as a former SNY inmate;

70. Placing SAMANIEGO, an inmate whose in-custody offenses and disciplinary history in both his first and second terms involved fights, melees, and physical altercations with known enemies, gang and STG associates/members, and rivals into an integrated yard with individuals who had an incentive, opportunity, and motive to attack SAMANIEGO in a coordinated fashion;

71. Placing SAMANIEGO, an inmate with bona fide mental health concerns recognized by his CCCMS and later EOP designation into an integrated yard with individuals who had an incentive, opportunity, and motive to attack SAMANIEGO in a coordinated fashion;

72. Failing to properly evaluate, screen, and ensure the welfare and safety of SAMANIEGO before housing him in an integrated yard without the substantial risk of serious injury based on threats to him, individually and in the cumulative, because of SAMANIEGO's case and custody factors enumerated herein;

73. Failing to properly evaluate, screen, and otherwise ensure that EACH of the five alleged assailants – Javier Cervantes (AH0612), Edgar Flores (AE9033), Jose Avila (BC2602), Aaron Stapleton (G36652), Leonard Cortez (AM9870) – could be housed, transported, or kept safely in proximity to SAMANIEGO given, individually and collectively, their respective gang ties, STG status, criminal histories, and in-custody histories insofar as whether such factors would have or did alert DEFENDANTS against housing each or all of the assailants in proximity to SAMANIEGO.

74. Not intervening in and or protecting SAMANIEGO, and otherwise standing by and observing while SAMENIEGO was brutally beaten by five assailants in plain view of DEFENDANTS;

75. Standing by and allowing such a brutal beating to go on for an unreasonable period of time, and failing to intervene in any appreciable way, resulting in unnecessary and severe injury to SAMANIEGO and rendering him a complete quadriplegic;

76. Failing to properly care for and treat SAMANIEGO while he was injured and vulnerable in the immediate aftermath of the attack, including but not limited to securing a neck brace, ensuring that he was strapped to and or secured to the transport cot, and or taking his vitals, among other medically necessary steps.

77. SAMANIEGO is informed and believes that ALL DEFENDANTS knew about the risk that the alleged assailants posed to him because DEFENDANTS knew of the risks posed by being on an integrated yard to SAMANIEGO due to his physical appearance, prior gang renunciation, commitment offense, prosocial self-help activities, particular in-custody offenses, and his SNY and CCCMS/EOP status.

78. Even in the face of such knowledge, DEFENDANTS did not take measures to stop the attack or act in any way to prevent harm to SAMANIEGO.

79. DEFENDANTS acted intentionally, recklessly and with deliberate indifference, subjecting SAMANIEGO to conditions that posed a substantial risk of serious harm and in fact resulted in serious irreversible harm to him.

80. As a direct and proximate result of the foregoing, SAMANIEGO is now permanently paralyzed, and has sustained profound injury and damage, both economic and non-economic, as set forth herein.

## SECOND CAUSE OF ACTION

## DEPRIVATION OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983

### (Entity Liability)

### (AGAINST ALL NAMED DEFENDANTS and DOES 1-10)

81. SAMANIEGO repeats and re-alleges each allegation contained in paragraphs 1 through 80 above as if fully set forth herein.

82. SAMANIEGO is informed and believes and thereon alleges that, at all relevant times, ALL DEFENDANTS, with deliberate indifference, and conscious and reckless disregard to the safety, security and constitutional rights of SAMANIEGO, maintained, enforced, tolerated, ratified, permitted, acquiesced in, and/or applied, among others, the following policies, practices, and customs:

   a. Failing to adequately train, supervise, and control correctional officers in the proper recognition of dangerous inmates and violent situations.

   b. Failing to adequately train, supervise, and instruct correctional officers in properly monitoring, deterring, controlling and responding to inmate altercation, attacks, and other violence.

   c. Failing to establish policies and procedures that enable identification and separation of inmates who are known enemies of other inmates and or who could be dangerous or violent to those inmates.

   d. Failing to adequately train, supervise, and control correctional officers in the proper response to threats of violence or actual violence.

  e. Failing to establish policies and procedures to reduce the risk of inmate injury by providing for immediate response to inmate violence or threats of violence.

  f. Failing to establish policies and procedures to reduce the risk of inmate injury by ensuring that any injured inmate is rightfully cared for and or given the proper medical attention in the aftermath of a serious injury, especially, but not exclusive, to the victim's spinal cord.

83. As a direct and proximate result of the foregoing, SAMANIEGO sustained serious injury and damage as proved and as more specifically stated above.

## JURY TRIAL DEMAND

84. SAMANIEGO hereby respectfully demands a jury trial in this action pursuant to Rule 38 of the Federal Rules of Civil Procedure.

## PRAYER

WHEREFORE, SAMANIEGO respectfully requests this Court grant judgment against DEFENDANTS as follows:

1. For general and compensatory damages according to proof;
2. For special damages according to proof;
3. For future special damages according to proof;
4. For punitive and exemplary damages against each individual and DOEs 1-10 DEFENDANTS, not against the public entities, according to proof;
5. Pursuant to 42 U.S.C. § 1988, for costs of suit, including attorney's fees, incurred herein; and
6. For pre- and post-judgment interest to the extent permitted by law; and
7. For such other and further relief as the Court deems just and proper.

//

//

Respectfully submitted:

DATED: December 24, 2019                    *Charles Carbone, Esq/ /S/*

                                            CHARLES CARBONE, ESQ.

                                            CHARLES CARBONE, ESQ.
                                            (CA SBN 206536)
                                            PRISONER RIGHTS ATTORNEY
                                            LAW OFFICE
                                            POB 2809
                                            SAN FRANCISCO, CA 94126
                                            TELEPHONE: 415-981-9773
                                            EMAIL: CHARLES@CHARLESCARBONE.COM

                                            THE LAW OFFICES OF MARK REDMOND, P.C.
                                            Mark A. Redmond (SBN 161520)
                                            555 University Avenue, Suite 154
                                            Sacramento, California 95825
                                            Telephone: (916) 444-8240
                                            Email:

                                            ATTORNEYS FOR PLAINTIFF
                                            FERNANDO SAMANIEGO

# PROOF OF SERVICE

Case Name: SAMANIEGO v. CDCR, et. al.,

I reside in the county of San Francisco, State of California. I am over the age of 18 years and not a party to the within action. My business address is P.O. Box 2809, San Francisco, CA 94126. On the date set forth below, I served a copy of the document(s) described as:

**COMPLAINT & SUMMONS**

Correctional Law Unit
ATTORNEY GENERAL
1300 I St.
Suite 125
POB 944255
Sacramento, CA 94244-2550
(via US mail)

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 24th day of December 2019 at San Francisco, California.

/s/ Charles Carbone
Charles F.A. Carbone, Esq.