UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FERNANDO SAMANIEGO,<br><br>        Plaintiff,<br><br>    v.<br><br>CDCR, et al.,<br><br>        Defendants. | No.  2:19-cv-2606 TLN KJN P<br><br><br>FINDINGS AND RECOMMENDATIONS |

Plaintiff is a state prisoner, proceeding through counsel, with a civil rights action pursuant to 42 U.S.C. § 1983. The court's filing fee was paid. On June 16, 2020, plaintiff filed an amended complaint. Defendants' motion to dismiss is before the court.

As discussed below, the undersigned recommends that defendants' motion be granted in part and denied in part.

I. Motion to Dismiss:  Legal Standards

Rule 12(b)(6) of the Federal Rules of Civil Procedures provides for motions to dismiss for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In considering a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the court must accept as true the allegations of the complaint in question, Erickson v. Pardus, 551 U.S. 89 (2007), and construe the pleading in the light most favorable to the plaintiff. Jenkins v.

McKeithen, 395 U.S. 411, 421 (1969); Meek v. County of Riverside, 183 F.3d 962, 965 (9th Cir. 1999). Still, to survive dismissal for failure to state a claim, a pro se complaint must contain more than "naked assertions," "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555-57 (2007). In other words, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements do not suffice." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). Furthermore, a claim upon which the court can grant relief must have facial plausibility. Twombly, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678. Attachments to a complaint are considered to be part of the complaint for purposes of a motion to dismiss for failure to state a claim. Hal Roach Studios v. Richard Reiner & Co., 896 F.2d 1542, 1555 n.19 (9th Cir. 1990). The court "need not accept as true allegations contradicting documents that are referenced in the complaint or that are properly subject to judicial notice." Lazy Y Ranch Ltd. V. Behrens, 546 U.S. F.3d 580, 588 (9th Cir. 2006).

A motion to dismiss for failure to state a claim should not be granted unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claims which would entitle him to relief. Hishon v. King & Spaulding, 467 U.S. 69, 73 (1984).

II. Civil Rights

To state a civil rights claim under § 1983, a plaintiff must allege: (1) the violation of a federal constitutional or statutory right; and (2) that the violation was committed by a person acting under the color of state law. See West v. Atkins, 487 U.S. 42, 48 (1988); Jones v. Williams, 297 F.3d 930, 934 (9th Cir. 2002). An individual defendant is not liable on a civil rights claim unless the facts establish the defendant's personal involvement in the constitutional deprivation or a causal connection between the defendant's wrongful conduct and the alleged constitutional deprivation. See Hansen v. Black, 885 F.2d 642, 646 (9th Cir. 1989); Johnson v. Duffy, 588 F.2d 740, 743-44 (9th Cir. 1978). That is, plaintiff may not sue any official on the sole theory that the official is liable for the unconstitutional conduct of his or her subordinates. Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009); Crowley v. Bannister, 734 F.3d 967, 977 (9th Cir.

2013) ("Under Section 1983, supervisory officials are not liable for actions of subordinates on any theory of vicarious liability."); OSU Student All. v. Ray, 699 F.3d 1053, 1076 (9th Cir. 2012) (citing Iqbal).

The requisite causal connection between a supervisor's wrongful conduct and the violation of the prisoner's constitutional rights can be established in a number of ways, including by demonstrating that a supervisor's own culpable action or inaction in the training, supervision, or control of his subordinates was a cause of plaintiff's injury. Starr v. Baca, 652 F.3d 1202, 1208 (9th Cir. 2011). Such liability may be found without any personal participation if the official implemented "a policy so deficient that the policy itself is a repudiation of the constitutional rights and is the moving force of the constitutional violation." Redman v. Cty. of San Diego, 942 F.2d 1435, 1446 (9th Cir. 1991) (citations and quotations marks omitted), abrogated on other grounds by Farmer v. Brennan, 511 U.S. 825 (1970).

III. Plaintiff's Amended Complaint

Plaintiff alleges the following. Following his conviction for carjacking, plaintiff was first incarcerated in 2011, and was identified by CDCR officials as a member of a Sureno street gang known as East Side Bolen. He served almost three years, during which he was housed "largely in either General Population yards and/or in administrative segregation." (ECF No. 15 at 7.) Plaintiff incurred about fourteen serious rules violations during his first term, three of which involved alleged battery on other inmates.

Several months after his release, plaintiff reoffended and was subsequently convicted of child endangerment and sentenced to a second prison term. His second prison term began in December of 2014, at which time plaintiff informed prison staff that he elected to drop out of his gang, and asked to be designated as a Sensitive Needs Yard ("SNY") inmate. Plaintiff's face was, and is, covered with tattoos indicating his gang affiliation, and plaintiff believed that his child endangerment conviction could expose him to an attack by fellow inmates. From December 2014 to September 2018, plaintiff was housed on SNY yards with the objective to separate plaintiff from gang members and known enemies.

During his second term, plaintiff was eligible for and in need of mental health care

3

services, having suffered depression, anxiety and psychosis.  He was initially designated to receive mental health care at the CCCMS level, but in August of 2018, he was elevated to the EOP level.[1]  Plaintiff took GED classes, and participated in Narcotics Anonymous ("NA") and Criminals & Gang Members Anonymous ("CGA").

Plaintiff also sustained serious rules violations during his second term:  refusing a urinalysis; two batteries on an inmate, one with and one without a weapon; one related to inmate manufactured alcohol; and delaying a correctional officer in the performance of duties.  In addition, he incurred a third prison term as a result of battery on a prisoner with a weapon.

Around May of 2018, all defendants and Does 1 - 10 implemented a policy of "Non-Designated Programming Yards" ("NDPF") such that SNY prisoners would no longer necessarily be segregated from general population inmates.  Defendants were aware that implementation of these NDPF yards had resulted in injuries at prisons in California.

On September 28, 2018, plaintiff was transferred to CSP-Sacramento, a largely maximum security level (IV) prison.  On September 28, 2018, plaintiff appeared before a classification committee ("UCC"), composed of defendants Ramirez, Spangler, and Parsons, who reviewed plaintiff's critical case factors and determinants, and decided plaintiff could be, and was, transferred to a NDPF yard.  On November 1, 2018, defendant Curry, Classification Staff Representative, reviewed the UCC decision to house plaintiff on a NDPF yard.

On the morning of November 1, 2018, plaintiff entered an integrated yard and was attacked by five prisoners (two armed with inmate-manufactured weapons), who allegedly "have ties to street gangs, prison gangs, and or Security Threat Groups, and or were enemies of [plaintiff]."  (ECF No. 15 at 20.)  Plaintiff was stabbed in the bladder, ear, face, and spine, pushed to the ground and beaten, and suffered a collapsed lung and broken neck, eventually losing consciousness.

---

[1] The Mental Health Services Delivery System Program Guide for the California Department of Corrections and Rehabilitation provides four levels of mental health care services:  Correctional Clinical Case Management System ("CCCMS"); Enhanced Outpatient ("EOP"); Mental Health Crisis Bed ("MHCB") and inpatient hospital care.  Coleman v. Brown, 2013 WL 6491529, at *1 (E.D. Cal. Dec. 10, 2013).

Prior to losing consciousness, plaintiff saw approximately five correctional officers observing the attack, which number increased to perhaps fifteen officers as the attack progressed. Defendant Does 1 -10 did not intervene or take sufficient action to stop the initial and ongoing attack on plaintiff.

When the five inmate attackers appeared at their UCC hearings, all defendants and Does 1 - 10 allowed each of them to be housed on the same NDPF yard as plaintiff, despite knowing that the attacking inmates had ties to street gangs, prison gangs, or Security Threat Groups, or were enemies of plaintiff. Three of the inmate assailants were gang members serving murder convictions, and would be considered life prisoners based on their indeterminate sentences. (ECF No. 15 at 19 (inmates Avila, Stapleton and Flores).) In addition to the seven risk factors identified by plaintiff, defendants and Does 1 - 10 should not have housed the five inmates who attacked plaintiff on the same NDPF yard as plaintiff because plaintiff's conviction for child endangerment was not violent, and defendants Lynch and Does 1-10 were deliberately indifferent by allowing such integration with plaintiff.

It was common policy and practice for defendant Lynch to review UCC decisions, including the September 28, 2018 decision to house plaintiff on a NDPF yard, as well as any UCC decision to house the five inmate attackers on the same NDPF yard as plaintiff. (ECF No. 15 at 13.)

As a result of his serious injuries, plaintiff, now 28, is a complete quadriplegic, and has been granted medical parole.

IV. Eighth Amendment Failure to Protect Standards

"[P]rison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners." Farmer, 511 U.S. at 833 (internal quotations and citation omitted). "The failure of prison officials to protect inmates from attacks by other inmates may rise to the level of an Eighth Amendment violation when: (1) the deprivation is 'objectively, sufficiently serious' and (2) the prison officials had a 'sufficiently culpable state of mind,' acting with deliberate indifference." Hearns v. Terhune, 413 F.3d 1036, 1040 (9th Cir. 2005) (quoting Farmer, 511 U.S. at 834). The second prong of this test is subjective, and "the official must both be aware of facts from which

5

the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." See Farmer, 511 U.S. at 837. "'Deliberate indifference entails something more than mere negligence but is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.'" Hearns, 413 F.3d at 1040 (quoting Farmer, 511 U.S. at 835) (internal alterations omitted). One way this can be established is "if the inmate shows that the risk posed by the deprivation is obvious." Thomas v. Ponder, 611 F.3d 1144, 1150 (9th Cir. 2011) (citing Farmer, 511 U.S. at 842 ("[A] factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.")). "[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under [the Supreme Court's] cases be condemned as the infliction of punishment." Farmer, 511 U.S. at 838; Peralta v. Dillard, 744 F.3d 1076, 1086 (9th Cir. 2014) ("Even if a prison official *should* have been aware of the risk, if he was not, then [he] has not violated the Eighth Amendment, no matter how severe the risk.") (internal quotation and citation omitted), cert. denied, 574 U.S. 1073 (2015). In addition, "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably." Farmer, 511 U.S. at 844.

V. Discussion

    A. Defendant Diaz

The undersigned is persuaded that plaintiff fails to state a claim against defendant Diaz. As argued by defendants, plaintiff's allegations as to defendant Diaz are solely based on his role as Secretary of the CDCR under a theory of respondeat superior. Plaintiff is required to plead facts demonstrating that defendant Diaz, by his own actions, violated the Constitution. Iqbal, 556 U.S. at 676. Although plaintiff contends that defendant Diaz was responsible for CDCR policies and protocols, including creating security protocols for safe housing, mixing medium and high security inmates, and procedures regarding how correctional staff were to quell violence on CSP-Sacramento yards, plaintiff fails to allege any facts demonstrating a link or connection from Diaz to plaintiff's placement on the NDPF yard. Plaintiff alleges no facts showing that he informed defendant Diaz that plaintiff faced a specific risk if housed on the NDPF yard, or that Diaz

assigned plaintiff to the NDPF yard.  In his opposition, plaintiff argues that Diaz "knew of all the facts set forth above as to the specific vulnerability of [plaintiff]."  (ECF No. 21 at 14.)  But such allegation is not included in the amended complaint, and plaintiff fails to identify facts showing how defendant Diaz, Secretary of the CDCR, was allegedly aware of plaintiff's specific vulnerability.  Plaintiff's general allegations that "all defendants" knew of the dangers of housing sensitive needs inmates in an integrated yard (ECF No. 13 at ¶¶ 32-33) are insufficient to demonstrate that defendant Diaz was personally aware of a specific threat to plaintiff's safety if he was housed on a NDPF yard.  See Johnston v. Diaz, 2020 WL 5630278, at *6 (S.D. Cal. Sept. 21, 2020) (dismissing Eighth Amendment claim against Kernan or Diaz because prisoner did not allege that either of them "was involved in assigning plaintiff or his cellmate to an integrated yard or had any reason to believe that plaintiff's cellmate posed a danger to plaintiff").

Plaintiff has had an opportunity to amend to allege specific facts as to defendant Diaz' involvement, yet failed to adduce facts demonstrating Diaz' link or connection to the incident at issue.  Accordingly, defendant Diaz should be dismissed.

B. NDPF Policy

Plaintiff attempts to hold defendant Diaz and all of the defendants liable solely based on their alleged role in implementing and supervising the integration policy.  Plaintiff argues that defendant Diaz "effectuated the policies that lead to [plaintiff] being housed in the integrated yard despite his sensitivity."  (ECF No. 21 at 14.)  Such liability may exist without any personal participation if the official implemented "a policy so deficient that the policy itself is a repudiation of the constitutional rights and is the moving force of the constitutional violation."  Redman, 942 F.2d at 1446.  But plaintiff does not challenge the constitutionality of the integration policy, or demonstrate that any defendant "implement[ed] a policy so deficient that the policy itself is a repudiation of constitutional rights and is the moving force of the constitutional violation."  Hansen, 885 F.2d at 646 (internal quotation and citation omitted).  Rather, plaintiff recognized that prison officials were aware that the policy and its implementation required a "careful and highly deliberate manner of integration to avoid preventable assaults. . . ."  (ECF No. 15 at 16.)  Such recognition does not demonstrate that the integration policy, standing

7

alone, was the moving force of the constitutional violation alleged here.

Taking plaintiff's allegations as true, plaintiff demonstrates that defendants established an integration policy that would require care in its implementation, not that any defendant implemented or supervised a policy so defective that it posed a substantial risk of obvious harm. Thus, it appears unlikely that plaintiff could amend to state a cognizable civil rights claim based solely on the implementation and supervision of the integration policy.  See, e.g., Montalvo v. Diaz, 2020 WL 3469365, at *6 (dismissing Eighth Amendment claims because plaintiff failed to allege that Diaz or Allison were "personally aware" of risks associated with integrated yards or harms resulting therefrom, or demonstrate that implementing the NDPF policy was so deficient it was the moving force of a constitutional violation); Mendez v. Diaz, 2020 WL 1974231, at *5 (E.D. Cal. Apr. 24, 2020) (prisoner failed to state claim against Diaz and Allison because prisoner did not allege that they were "aware of a non-speculative, specific risk to Plaintiff's health and safety," nor were there "any facts demonstrating that implementation of the NDPF policy would always violate the Eighth Amendment, no matter which SNY or [general-population] inmates or which Level 1 or 2 prison yards the policy was applied to"), adopted, 2020 WL 2731993 (E.D. Cal. May 26, 2020); Andrade v. Diaz, No. 20-cv-0137 FMO JC (C.D. Cal. Nov. 19, 2020) (prisoner failed to provide "non-speculative facts showing that Moving Defendants knew of a high risk of such attacks prior to implementing the NDPFs at CIM or any other institution.").  The undersigned recommends plaintiff's claims based solely on the NDPF policy be dismissed from this action with prejudice.

C. Defendant Lynch

In the amended complaint, plaintiff raises the same allegations as pled against defendant Diaz concerning policies, procedures, and supervision, and are solely based on defendant Lynch's role as warden.  Such allegations fail to state a cognizable claim for the same reasons set forth above.

Plaintiff also alleges that defendant Lynch was "personally involved in decisions made at inmate classification committee hearings . . . analogous to and including those directly affecting plaintiff."  (ECF No. 15 at ¶ 9.)  Plaintiff alleges it was custom and practice or common policy

8

and practice for defendant Lynch to review inmate transfers and assignments, and UCC decisions. (ECF No. 15 at ¶¶ 9, 51.) Plaintiff further alleges the UCC decisions rendered as to plaintiff, as well as the five inmate assailants, were "fully reviewable and independently subject to consideration, input and evaluation" by defendant Lynch. (ECF No. 15 at ¶¶ 53, 55.) However, plaintiff fails to identify defendant Lynch's personal involvement in any of plaintiff's UCC hearings, the hearings of the inmate assailants, or Lynch's actual review or evaluation of any of those UCC decisions. Simply showing that the warden had the authority to review such decisions does not demonstrate that he did, and therefore fails to demonstrate that defendant Lynch knew of, yet disregarded a substantial risk to plaintiff's safety.[2] Moreover, even if it were plausible that defendant Lynch reviewed the September 18, 2018 UCC decision, it is unclear when such review would have occurred. Plaintiff conveniently pled that the decision is reviewable by Lynch in between plaintiff's allegation that after the committee reached its UCC decision, it was forwarded to defendant Curry for further review. (ECF No. 15 at ¶ 53.) But if Lynch's review took place after Curry reviewed the UCC decision on November 1, 2018, the same day plaintiff was attacked, such review by Lynch would not have caused plaintiff's injuries.

Plaintiff argues that defendant Lynch "knew of all the facts set forth above as to the specific vulnerability of [plaintiff]," and knew plaintiff "would be vulnerable to animus and assault due to those and other circumstances." (ECF No. 21 at 14.) But plaintiff points to no facts demonstrating that defendant Lynch knew plaintiff, was present at plaintiff's UCC hearing on September 18, 2018, or reviewed the UCC decision as to plaintiff's placement prior to the November 1, 2018 attack. Similarly, plaintiff provided no such specific facts as to the five attacking inmates.

---

[2] Indeed, one district court noted that such duties may be delegated to staff other than the warden. "[I]nstitutional regulations delegate initial housing assignments and their annual reviews to staff members other than the warden. Compare Cal. Code Reg., tit. 15 § 3376(c)(1)-(2) (composition of Initial and Unit Classification Committees, which review an inmate's case upon transfer and at least annually thereafter) with § 3376(c)(2) (composition of Institution Classification Committees, which, *inter alia*, recommend transfer of inmates and act on cases referred by lower committees)." See Becker v. Sherman, 2017 WL 6316836, at *7 (E.D. Cal. Dec. 11, 2017), adopted, 2018 WL 623617 (E.D. Cal. Jan. 30, 2018) (policies regarding the housing of transgender prisoners and four assaults against the plaintiff supported Monell claim).

For all of these reasons, defendant Lynch should be dismissed. In his opposition, plaintiff identified no facts that he could plead that would demonstrate defendant Lynch's personal involvement herein. Therefore, plaintiff is not granted leave to amend at this time. However, should plaintiff adduce facts through discovery that demonstrate defendant Lynch's personal involvement, either with plaintiff's or any of the attacking inmates' UCC hearings or reviews of the UCC decisions, plaintiff may seek leave to amend at that time. Accordingly, defendant Lynch should be dismissed without prejudice.

### D. Defendants Ramirez, Spangler & Parsons

Defendants argue that plaintiff fails to allege such defendants knew of, and disregarded, a specific or significant risk to plaintiff. (ECF No. 18-1 at 8; 22 at 4.)

But taking plaintiff's allegations as true, plaintiff alleges that such defendants were deliberately indifferent to an excessive risk of harm by placing plaintiff on a NDPF yard despite knowing plaintiff's face was covered with gang-identifying tattoos, plaintiff was a former gang member who had renounced his gang affiliation, was previously assigned SNY housing for almost four years, had sustained a conviction for child endangerment, suffered mental health issues, and attended NA and CGA. Plaintiff contends that all of these attributes constituted plaintiff's unique and excessive risk of harm he faced if housed on the NDPF yard. Arguably, the gang-related tattoos on plaintiff's face constitute a specific risk because plaintiff was at risk of attack from members of rival gangs, particularly where plaintiff's gang affiliation was obvious and could not be hidden from view, or at risk of attack from members of his former gang who might be angry plaintiff renounced gang membership. Thomas, 611 F.3d at 1150 (citing Farmer, 511 U.S. at 842 ("[A] factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.")). Plaintiff argues that his case is similar to Cortez v. Skol, 776 F.3d 1046, 1051 (9th Cir. 2015), where the Circuit reversed the grant of summary judgment on a deliberate indifference claim. Id. Inmate Cortez was attacked by two fellow inmates while all three were being escorted by a single guard through a dangerous part of the prison. Id. The Circuit found Cortez had adduced evidence that the escorting officer: (i) knew about the hostility between the inmates based on the inmates' harassing conversation, (ii) was

aware of the plaintiff's protective custody status, and (iii) knew prison policy required leg restraints for these inmates during escort but did not put them in leg restraints. See id. at 1052-53. Here, plaintiff argues that seven different specific risk factors joined together to put plaintiff's UCC committee on notice of the specific risks he faced if plaintiff was on the NDPF yard.

The undersigned finds that defendants parse plaintiff's claims against defendants Ramirez, Spangler and Parsons too narrowly, and their motion to dismiss should be denied. Of course, at summary judgment, defendants may be able to adduce evidence that they were not deliberately indifferent to an excessive risk of harm by deciding to place plaintiff on the NDPF yard, despite his obvious facial tattoos or other risk factors. But at this stage of the proceedings, the undersigned finds that such defendants are not entitled to dismissal.

E.  Defendant Curry

On the other hand, while defendant Curry may have become aware of plaintiff's unique circumstances upon review of the September 18, 2018 UCC decision, plaintiff pleads that defendant Curry did not review the UCC decision until November 1, 2018. Plaintiff was attacked on the morning of November 1, 2018. Although plaintiff does not allege the time of day that defendant Curry issued the review, the undersigned cannot find that defendant Curry was responsible for plaintiff's attack based on such timing.

In his opposition, plaintiff now argues that had defendant Curry earlier reviewed the UCC decision, the attack could have been prevented. (ECF No. 21 at 15.) But as argued by defendants, plaintiff did not allege such facts in his pleading. Rather, plaintiff alleges that on November 1, 2018, defendant Curry "personally gave inadequate or insufficient consideration and indeed deliberate indifference to [plaintiff's] safety concerns." (ECF No. 15 at 14.) Moreover, plaintiff's new argument does not demonstrate that his claim against defendant Curry could be cured by amendment because it is based on mere speculation. The undersigned finds that defendant Curry should be dismissed. However, because it is unclear whether defendant Curry may have been involved in reviewing the placement of the attacking inmates housed on the same NDPF yard as plaintiff, such dismissal should be without prejudice.

////

11

F. Medical Attention

In paragraph 8 of the amended complaint, plaintiff alleges that defendants Diaz and Lynch were responsible for all policies and practices at CSP-Sacramento, "regarding the timing and manner of the medical attention to be utilized on prison grounds to treat any inmate," including plaintiff, who was injured and required serous medical attention. (ECF No. 15 at 3.) However, as discussed above in connection with the NDPF policy, plaintiff alleges no facts linking defendants Diaz and Lynch to the November 1, 2018 attack or the medical care provided thereafter. Thus plaintiff's allegation is solely based on a theory of respondeat superior which is insufficient to demonstrate an Eighth Amendment violation. Therefore, such claim is dismissed as to defendants Diaz and Lynch.

G. Failure to Intervene

As noted by defendants, plaintiff concedes that his failure to intervene allegations do not state a claim against the named defendants. (ECF No. 21 at 14.) Rather, plaintiff's failure to intervene allegations are pled solely as to DOES 1-10. As such, they are not subject to dismissal by the named defendants.

VI. Qualified Immunity

A. Legal Standards

Qualified immunity applies when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. White v. Pauly, 137 S. Ct. 548, 551 (2017). Officers are entitled to qualified immunity under § 1983 unless (1) the officers violate a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was "clearly established at the time." District of Columbia v. Wesby, 138 S. Ct. 577, 589 (2018); White, 137 S. Ct. at 551. "Clearly established" means that the statutory or constitutional question was "beyond debate," such that every reasonable official would understand that what he is doing is unlawful. See Wesby, 138 S. Ct. at 589; Vos v. City of Newport Beach, 892 F.3d 1024, 1035 (9th Cir. 2018). This is a "demanding standard" that protects "all but the plainly incompetent or those who knowingly violate the law." Wesby, 138 S. Ct. at 589 (citing Malley v. Briggs, 475 U.S. 335, 341 (1986)). To be "clearly established," a rule

must be dictated by controlling authority or by a robust consensus of cases of persuasive authority. Wesby, 138 S. Ct. at 589; see also Perez v. City of Roseville, 882 F.3d 843, 856-57 (9th Cir. 2018) (noting that Ninth Circuit precedent is sufficient to meet the "clearly established" prong of qualified immunity); Hamby v. Hammond, 821 F.3d 1085, 1095 (9th Cir. 2016) ("[D]istrict court decisions -- unlike those from the courts of appeals -- do not necessarily settle constitutional standards or prevent repeated claims of qualified immunity."). In examining whether a rule/right is clearly established, courts are to define the law to a "high degree of specificity," and not "at a high level of generality." Wesby, 138 S. Ct. at 590; Kisela v. Hughes, 138 S. Ct. 1148, 1152 (2018). The key question is "whether the violative nature of particular conduct is clearly established" in the specific context of the case. Vos, 892 F.3d at 1035 (quoting Mullenix v. Luna, 136 S. Ct. 305, 308 (2015)). Although it is not necessary to identify a case that is "directly on point," generally the plaintiff needs to identify where an officer acting under similar circumstances was held to have violated federal right. Wesby, 138 U.S. at 577; Vos, 892 F.3d at 1035; Felarca v. Birgeneau, 891 F.3d 809, 822 (9th Cir. 2018); Shafer v. City of Santa Barbara, 868 F.3d 1110, 1118 (9th Cir. 2017).

B.  Discussion

Since 1994, it has been clearly established that prison staff and officials "have a duty to protect prisoners from violence at the hands of other prisoners." Farmer, 511 U.S. at 833. "[A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety." Id. at 837. "The question under the Eighth Amendment is whether prison officials, acting with deliberate indifference, exposed a prisoner to a sufficiently substantial "risk of serious damage to his future health," and it does not matter whether the risk comes from a single source or multiple sources, any more than it matters whether a prisoner faces an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a risk." Farmer, 511 U.S. at 843, quoting Helling v. McKinney, 509 U.S. 25, 35 (1993).

At the time of the events at issue, the law was clearly established that the deliberate indifference standard "does not require that the guard or official believe to a moral certainty that

1   one inmate intends to attack another at a given place at a time certain before that officer is

2   obligated to take steps to prevent such an assault." Berg, 794 F.2d at 459 (quotations and

3   citations omitted); see also Farmer, 511 U.S. at 843 ("Nor may a prison official escape liability

4   for deliberate indifference by showing that, while he was aware of an obvious, substantial risk to

5   inmate safety, he did not know that the complainant was especially likely to be assaulted by the

6   specific prisoner who eventually committed the assault.").

7       While defendants believe plaintiff has not identified a specific threat of harm, plaintiff

8   alleges special risk factors that he argues, taken together, constituted an obvious threat of harm.[3]

9   Given that plaintiff appeared before the UCC hearing at which defendants Ramirez, Parsons and

10  Spangler were committee members, they would have seen, firsthand, plaintiff's facial tattoos, as

11  well as reviewed the risk factors identified by plaintiff in order to address plaintiff's placement on

12  the NDPF yard, as opposed to the SNY yard where he was previously housed for almost four

13  years. Defendants contend they are entitled to qualified immunity because it was not clearly

14  established that a prison employee violates an inmate's constitutional rights when he places an

15  inmate who is a former gang member on the same yard with other gang members. (ECF No. 22

16  at 8.) But defendants overgeneralize and minimize plaintiff's allegations, failing to address the

17  issue of plaintiff's gang-related facial tattoos or how all seven of the alleged special risk factors

18  could accumulate to pose a substantial risk of harm. The undersigned finds that at this stage of

19  the proceedings, defendants Ramirez, Parsons and Spangler are not entitled to qualified

20  immunity.

21  IX.   Order and Recommendations

22      Accordingly, IT IS HEREBY RECOMMENDED that defendants' motion to dismiss

23  (ECF No. 18) be granted in part and denied in part, as follows:

24      1. Defendant Diaz be dismissed with prejudice;

---

[3] Plaintiff failed to allege specific facts demonstrating the personal involvement of defendants Diaz, Lynch and Curry, and failed to demonstrate that implementing the NDPF policy was so deficient it was the moving force of a constitutional violation. Therefore, the undersigned need not address defendants' qualified immunity arguments as to such defendants or as to the NDPF policy. See, e.g., Aguilera v. Baca, 510 F.3d 1161, 1167, 1174 (9th Cir. 2007) (noting that if no constitutional violation occurred the court need not decide whether qualified immunity applies).

2. Plaintiff's challenge based solely on the integration policy be dismissed with prejudice;

3. Defendant Lynch be dismissed without prejudice;

4. Defendant Curry be dismissed without prejudice;

5. The motion to dismiss defendants Ramirez, Parsons, and Spangler be denied;

6. The named defendants' motion to dismiss plaintiff's failure to intervene claims be denied; and

7. The motion for qualified immunity as to defendants Ramirez, Parsons, and Spangler be denied without prejudice.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within thirty days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the objections shall be filed and served within fourteen days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated:  February 17, 2021

/sama2606.mtd

KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE